FIFTH NATIONAL BANK OF GRAND RAPIDS *v.* DUNHAM.

1. BANKS AND BANKING—TRUSTS—ESTOPPEL.

A bank to which a note is sent for payment upon request of its president, the indorser of the note, and which pays the same in accordance with his instructions, is estopped to assert, as against the holder of the note, that payment was in fact made from a trust fund created and placed in the hands of the president for the purpose of paying said note and certain other obligations held by the bank, which fund had proved inadequate to discharge the indebtedness in full.

2. SAME—MISAPPLICATION OF FUNDS.

A bank to whose president an insolvent debtor has transferred his property, by sundry conveyances, to secure certain of his creditors, which bank is the sole beneficiary in one of said transfers, and a partial beneficiary in each of the others, and which knowingly permits the trustee to apply upon the claims of other creditors moneys properly applicable to its claim alone, is estopped from insisting upon the return of any part of the moneys so paid, on the ground that the residue of the fund is insufficient to pay its claim in full, the subsequent conduct of such creditors having been materially influenced by the fact of said payments having been made.

Appeal from Kent; Adsit, J.    Argued October 8 and 9, 1895.    Reargued and submitted January 14, 1896.    Decided March 31, 1896.

Bill by the Fifth National Bank of Grand Rapids against William Dunham, trustee, and others, for an accounting.    From a decree for complainant, defendants appeal.    Reversed.

*Wesley W. Hyde* and *Myron H. Walker*, for complainant.

*Fletcher & Wanty*, for defendants Fourth National

Bank of Grand Rapids, Northern National Bank of Big Rapids, and First National Bank of Traverse City.

*Champlin & Stone*, for defendant City National Bank of Lansing.

*Kingsley & Kleinhans*, for defendant Detroit National Bank.

*FitzGerald & Barry* (*Francis A. Stace*, of counsel), for defendant T. Stewart White.

HOOKER, J. The W. Steele Packing & Provision Company, of Grand Rapids, was indebted as follows: To Fifth National Bank (complainant), $10,000; to Fourth National Bank, $7,500; to Northern National Bank, $5,000; to First National Bank of Traverse City, $3,000. It owed $21,000 to others not interested in this proceeding. Mr. Steele, its manager, was indebted as follows: To Fifth National Bank (complainant), $10,000; to Northern National Bank, $5,000; to Detroit National Bank, $5,000. All of this indebtedness, except that due the complainant, consisted of negotiable paper indorsed by Dunham, who was president and manager of the complainant bank.

On August 28, 1889, both Steele and the packing company were insolvent and the following instruments were executed to Dunham as trustee: The packing company gave: (1) A chattel mortgage on substantially all of its personal property, including "all personal chattels and effects, goods, provisions, books, and book accounts, and choses in action, * * * located at its packing house in Wyoming township." This may be designated the "Chattel Mortgage." (2) A real-estate mortgage upon the packing-house property in Wyoming township, which mortgage, after describing the real estate, included the following, viz.: "Also all the buildings, machinery, improvements, and chattels situate upon said premises." This mortgage will be designated the "Packing-House Mortgage." At the same time, Steele executed the following upon his individual property: (1) A real-estate mortgage upon property in Ionia, called the "Ionia Mortgage." (2) An

assignment of 70 shares of stock in the Fifth National Bank.

The packing company mortgages secured packing company paper, as follows: The chattel mortgage secured: Complainant, $10,000; Fourth National Bank, $2,500. This mortgage, on its face, purported to secure other claims; but complainant admits them to have been collateral to the $10,000 claim. The packing-house mortgage secured: Fourth National Bank of Grand Rapids, $5,000; Northern National Bank of Big Rapids, $5,000; First National Bank of Traverse City, $3,000. A second clause in this mortgage becomes immaterial, as the property did not produce a sufficient sum to pay the items having priority. The Steele mortgage and assignment secured his individual paper as follows: The Ionia mortgage secured: Complainant, $10,000; Northern National Bank of Big Rapids, $5,000; Detroit National Bank of Detroit, $5,000. The assignment of stock secured the Steele paper held by the Fifth National Bank, and it is contended that it covered the $5,000 note of Steele held by the Northern National Bank, which Steele testified that he supposed was held by complainant at that time; but we think that the weight of evidence is to the effect that it secured complainant only.

Had Dunham reduced all of the property to possession before disbursing it, no great difficulty should have been experienced in dividing it in conformity to the terms of the trust among those entitled to it; but he did not do this. On the contrary, he attempted to continue the business of the Steele Packing & Provision Company, opening an account in his own bank (*i. e.*, the complainant), in his name as trustee, and drawing upon the fund for the expenses of the business, and to pay paper falling due, and discounts upon renewals. Such renewals were made or indorsed by him personally. The bank stock was converted into money, and, instead of being used to pay the complainant's notes against Steele, was, in part, at least, applied to other paper as it became due, or to discounts

upon renewals. No serious difficulty is found in tracing the funds. Ordinarily, in such cases, those receiving more than their legitimate proportions will be required to surrender the excess, upon a bill filed for an accounting; and the bill in this cause is filed for such purpose. Manifestly, the misconduct and mistakes of the trustee will not relieve a *cestui que trust* from his duty to account to his fellow beneficiaries; and in this case, if the defendants are to avoid contribution, it is because of facts which make it inequitable for the complainant to ask such relief.

Different reasons are assigned by the various defendants why they should be entitled to retain the sums that they have severally received from the trustee. First, it is contended that the course of the trustee had the full approval and assent of the Fifth National Bank, and that, as the payments were made over its own counter, upon checks signed by Dunham as trustee, it cannot now be permitted to recall such assent, and recover from the defendants, especially as the defendants relied upon such payments, and Dunham was released in consequence, when he would otherwise have been held as indorser.

Dunham took possession of the property at once upon receiving the papers creating the trust. It will be remembered that each instrument was unlike the others, and no two secured identical obligations. A proper administration of the trust would have required the several funds received from the property covered by the respective instruments to be kept separate, and applied according to the terms of the various instruments. Dunham did not do this. He opened one account as trustee, and deposited moneys from the various sources therein. He paid notes and discounts upon renewals, as they became due, by drawing checks upon this fund. He carried on the business of the Steele Packing & Provision Company, including a retail meat market, paying the expenses, and, there is reason to believe, large losses, from this account, and, apparently, he used the Wyoming township real estate for the purposes of this business. About the

first thing done by him was in relation to the note of $2,500, held by the Fourth National Bank, upon which he was indorser. It fell due the day following the creation of the trust. He telephoned the holder to send it through the clearing house to the Fifth National Bank, and it would be paid. It was so sent, and it was paid, by its application in the adjustment of that day's business between these banks. It appeared upon the hearing that the Fifth National Bank carried this as a cash item for a time at Dunham's direction, and that he subsequently paid it from the trust fund. Complainant now claims that, in the accounting, the Fourth National Bank should be charged with the amount of such note as though it had received payment from the trust fund, and that, as the fund proved inadequate to full payment of the debts, it should account for the excess with interest.

We may, perhaps, profitably dispose of this question at this point. We think that the Fifth National Bank was under an obligation to treat that note as sent to it for payment. It saw fit to receive it and settle for it upon an understanding with Dunham, which it was not authorized to do on behalf of the holder. If not paid, it should have protested it, and returned it without delay. There is nothing to indicate that the Fourth National Bank expected it to be paid from the trust fund. It had been informed by Dunham that it would be paid if sent to the bank. Was it Dunham as trustee, or indorser, or president of the bank, who made this promise? Inasmuch as there was nothing to indicate that, as trustee, he had money to pay it, but, on the contrary, it quite clearly appears that he had not, it will not be unfair to assume that the direction was given as indorser, and that he arranged with his bank to pay the note and carry it for him. It cannot now shelter itself behind the claim that it relied on his promise as trustee, and carried the note as a cash item against the trustee. So far as this note is concerned, we think complainant estopped; and, for the

purpose of any accounting with the trustee, it is to be treated as though it purchased that note, and became entitled to its proportion of the fund obtained from the chattel-mortgaged property.

The Fourth National Bank had another claim. This was a packing company note of $5,000, with Dunham's indorsement. It was apparently a renewal of the note secured by the packing-house real-estate mortgage, and was sold for full consideration to the City National Bank of Lansing. Previous to its sale, the Fourth National Bank had received, as discounts, upon successive renewals of this paper, the sum of $449.99. It is contended that this sum should be considered in the accounting. We pass the question, to be considered later, with others of like character, and follow the history of the note itself. On October 8, 1890, it was sent by the City National Bank to the Fourth National Bank for collection, but was not paid. A renewal was returned, with the sum of $103.33 interest, which was paid by a trustee check, signed by Dunham, payable to the Fourth National Bank. We do not discover that further interest was paid on this note, and on March 10, 1891, Dunham filed his bill in the Kent circuit court, in chancery, to foreclose the packing-house real-estate mortgage. J. Edward Earle, who was a stockholder and an officer of the Fifth National Bank, was his solicitor, and the case was commenced upon the request of the City National Bank. It will be remembered that there was a second clause in this mortgage, which secured other creditors, among them the complainant. The debts to be first paid were this $5,000 note, owned by the City National Bank, a $5,000 note given to the Northern National Bank, which found its way to White (as will appear hereafter), and a $3,000 note owned by the First National Bank of Traverse City. A number of these beneficiaries asked leave to answer and file cross-bills, and this was permitted, nearly all doing so. The Fifth National Bank filed an answer and cross-bill, praying for an accounting, as follows:

"That the complainant should render a full and accurate account of all moneys by him received as said trustee, and from said securities, and of all acts by him done as such trustee, and asks the aid of this court in requiring from him a full and accurate account thereof, and of his disposition of the property that has come into his hands under the said trust, and of the proceeds thereof. This defendant asks the benefit of a cross-bill herein upon the facts alleged in this answer, under the rules and practice of this court permitting the same, and that it may have the same relief as though it had filed its cross-bill herein, and that the said complainant may come to a full and fair accounting of the said trust aforesaid."

The City National Bank also asked accounting. Testimony was taken and proof was made concerning expenses incurred for taxes and insurance, and services of watchmen in protecting the property, by the Grand Rapids Savings Bank, a defendant. The decree adjudged that the Traverse City National Bank's note of $3,000, the City National Bank's note of $5,000, and the note of $5,000 owned by White, had priority of payment. It then determined the notes entitled to consideration under the second clause of the mortgage; but these need not be considered, as the property did not bring a sufficient sum to pay those having priority. It found due upon the City Bank note, $6,588.89; White note, $6,601.11; Traverse City Bank note, $3,924.62. It found that payments had been made to the Traverse City Bank amounting to $1,207.31, together with interest, and ordered this sum to be paid to the register; and, if the Fifth National Bank, which claimed that these amounts had been paid from the chattel-mortgage fund, should begin proceedings for an accounting with Dunham and the two banks and White within 30 days, it should be held by the register to await the final decree in such proceeding; otherwise, it should be divided among the two banks and White. An allowance of $856.51 was made to the Grand Rapids Savings Bank for expenses. On appeal, this court affirmed the decree, the only change being an increased

allowance for expenses. 100 Mich. 75. The decree was dated September 22, 1893, and was affirmed by decree of this court filed after this suit was begun. The bill in this cause was sworn to October 30, 1893. It is now contended that the decree in said cause was conclusive between the parties, as to their respective shares in the proceeds of said mortgage, except as to the amount paid to the Traverse City Bank, which was specially mentioned and left open, and that the complainant should not be permitted to claim from the City National Bank the $103.33 and interest which it received. For the same reason it denies complainant's right to recover from it a share of a further sum of $2,500 claimed by Dunham for expenses, services, etc., in managing and caring for this property, and of which the court allowed $2,285.85, the two items amounting, it is said, to over $900 against the City Bank.

T. Stewart White became owner of a note by purchase from Dunham, it being a renewal of the packing company note held by the Northern National Bank, indorsed by Dunham, who paid it, and, as stated, secured by the packing-house mortgage, and sold by Dunham to White. White, as already shown, was a party to the foreclosure case, and a decree was rendered against him for a portion of the sum of $2,285.85 allowed Dunham for expenses, etc. But, previous to the procurement of this note from the Northern National Bank by Dunham, and its transfer to White, the original note had been renewed several times, and interest to the amount of $309.99 had been paid, *through the complainant,* to whom the notes had been successively sent for collection, and the complainant seeks to recover this from the Northern National Bank.

The other note of $5,000, owned by the Northern National Bank, was also sent to complainant for collection, and $1,500 and interest was paid from the chattel-mortgage fund, and $3,500 and interest was paid from the proceeds of the bank stock. It will be remembered that this note was secured by the Ionia mortgage. Complainant asks to recover these amounts.

The Detroit note of $5,000 was sent to the complainant for collection. Payments were made, through complainant, as follows: February 7, 1890, $72.33; February 7, 1890, $1,000; April 22, 1890, $1,000; July 22, 1890, $1,000. On each occasion, time was given upon the balance, upon new paper, signed by Dunham; the original note being held until the new note should mature. It will be remembered that this note was, with others, secured upon Ionia real estate by a mortgage. This was foreclosed, and a decree was filed September 5, 1893. The property was sold to Welch, as trustee for the Fifth National Bank, the suit having been commenced at the request of Mr. Earle, a director of that bank. The decree found that the Northern National Bank had been fully paid, and the $3,000 paid to the Detroit bank was deducted from its claim, and a decree for $2,000 made on its behalf. The Fifth National Bank disavows all responsibility for this, saying that Dunham, and not the bank, was the party complainant, and that it was in no way responsible if the claim of the Detroit bank was reduced, that of the Northern National Bank wiped out, and itself permitted to absorb the bulk of the Ionia property, which it caused, or at least permitted, to be bid in to itself.

To recapitulate the amounts sought to be recovered by complainant:

1. Against the Fourth National Bank, a portion of the amount paid on the $2,500 note, and also the sum of $449.99 paid to the Fourth National Bank as interest on the $5,000 note subsequently sold to the City National Bank.

2. Against the City National Bank, $103.33 paid as interest on the $5,000 note, and about $800 which it is now claimed that Dunham expended in protecting the Wyoming township real estate, being a part of the $2,285.85 allowed by the circuit court.

3. Against the Traverse City National Bank, the amount of $1,207.31, payments made to it before foreclosure, being the amount deposited with the register, and also its proportionate share of the $2,285.85 mentioned.

4. Against T. Stewart White, for a proportionate share of said $2,285.85.

5. Against the Northern National Bank, $309.99 interest on note before its sale to T. Stewart White, and $5,000 and interest which complainant claims to have been paid from trust funds upon note secured by the Ionia mortgage.

6. Against the Detroit National Bank, payments of $3,072.33 upon note secured by the Ionia mortgage.

An examination of the testimony has satisfied us that the complainant was conversant with and assented to the attempt by Dunham to continue the business of the packing and provision company, and the payment and renewal of paper as it became due.    It knew the terms of the trust, and the deposit of the fund, the drawing and payment of checks to the various creditors and others, which checks it paid, and in some instances received and applied such checks and the avails thereof upon the obligations. It knew that the bank stock was reissued to Dunham, and, although it alone was interested in it, seems to have not concerned itself with the disposition made of it or its proceeds.    Its directors grumbled at the result of Dunham's conduct of the business, but permitted it, and we are convinced that it understood that the real estate in Wyoming township was being used in the business instead of being closed out.    Again, the course of the complainant in relation to the funds corroborates this.    Allusion has already been made to its disregard of its legal rights in the bank stock. It was equally careless in respect to the chattel property, which, if the defendants are right in their contention, was in part covered by the packing-house mortgage. Upon the foreclosure of this mortgage, it seems not to have occurred to the complainant to make claim in its answer that the various defendants had been paid by its securities, though it prays general accounting by Dunham; and at the hearing it seems to have made no claim of that kind against any of the defendants except the Traverse City Bank. Again, upon the foreclosure of the Ionia mortgage, while not technically a party to the proceedings, its members and so-

licitors were connected with the case, and through Dunham it secured a decree that determined that the Detroit National Bank claim was reduced, by payment, to $2,000, and that of the Northern National Bank extinguished. Every defendant had reason to suppose that it was paid by the assent of complainant, and in furtherance of a program which Dunham, then its president, was carrying out. They permitted the real estate to be used for the business. They allowed the personal property to be sold without setting up a claim to it under the real-estate mortgage, which, in terms, covers some of it, and which, to say the least, might in the minds of some clearly include it. They granted extensions of time on partial payment, accompanied by new promises to pay, until Dunham, the indorser, failed. They deferred foreclosure, and finally accepted their allotments under the decrees mentioned, upon the understanding that they had received payment. To now require them to reimburse the complainant would be to misapply the rule that, " of two, the least in fault should not suffer." We are of the opinion that the facts shown amply support the contention that the complainant should be estopped from asserting a claim to the moneys paid.

The decree of the circuit court against the appellants should be reversed, and the bill dismissed, with costs of both courts. Ordered accordingly.

The other Justices concurred.