DETROIT SAVINGS BANK *v.* LOVELAND.

1. ESTOPPEL—CONTRACTS—CORPORATIONS.

Where a contractor, pending negotiations with a mining company as to the sinking of a shaft for the purpose of mining rock salt, proceeded under an oral agreement with certain of the directors to do preliminary work, for which they were to be liable, but the corporation thereafter passed a resolution accepting the contractor's bid, and continued for several months to make advancements to the contractor, who continued to sink the shaft until the corporation had incurred an indebtedness of upwards of $7,000, and where he at no time advised the directors of his intention to hold them personally, or advised them of the progress of the work, but did acts inconsistent with such a theory, he is estopped to claim a personal liability.

2. SAME—DEFINITION.

Estoppel is a bar which precludes a person from denying the truth of a fact which has in contemplation of law become settled by the act of the party himself.

3. CONTRACTS—MEETING OF MINDS—MUTUALITY.

The necessary elements of a valid contract were lacking between the contractor and the directors, since their undertaking did not extend to the entire cost of sinking the shaft, but to preliminary work, which was not determined by the arrangement.

Error to Wayne; Mandell, J. Submitted November 14, 1910. (Docket No. 19.) Decided March 31, 1911. Rehearing denied March 30, 1912.

Assumpsit by the Detroit Savings Bank, assignee of George E. Currie, against Ralph Loveland, John A. Russell, George W. Williams, and George N. Skinner, for labor and materials furnished. Judgment for plaintiff. Defendant Loveland brings error. Reversed.

*Weadock & Weadock*, for appellant.

*Sidney T. Miller* and *Henry C. Walters* (*James Cosslett Smith*, of counsel), for appellee.

BROOKE, J. Plaintiff, as assignee of one George E. Currie, recovered a judgment against defendant in the sum of $8,672.81.

The declaration is in assumpsit and is accompanied by a bill of particulars which shows that the judgment represents the cost of partially sinking a shaft for a salt mine near the city of Detroit, less certain sums paid thereon, for which defendant is given credit. Defendant brings the case to this court for review by writ of error.

It appears that plaintiff's assignor, Currie, had, prior to 1901, for many years been engaged as a contractor, building railways, sewers, pavements, etc. Some time in the year 1900 one William H. Ashwell, a mining and civil engineer of some repute, having knowledge that a stratum of rock salt existed several hundred feet beneath the surface of the ground in the vicinity of the River Rouge, near Detroit, conceived the idea that it was practicable to sink a shaft to the stratum of salt and to profitably mine the same. He proceeded to prepare plans and specifications for such a shaft and submitted them to Currie, who, on December 1, 1900, submitted a tender to Ashwell to sink the shaft 800 feet for $120,000. This tender provided that, if he secured the contract, he would subscribe for $12,-000 of 7 per cent. accumulative, preference stock in the undertaking. From this tender, with its proviso, it is clear that at the inception of the project Currie contemplated entering into a contract for the sinking of the shaft, with a company thereafter to be formed, in which he himself proposed to become a stockholder to the amount of $12,000. Ashwell thereupon secured an option upon the land, necessary for the enterprise, from the Ecorse Land & Improvement Company. On January 12, 1901, the Michigan Rock Salt Company was organized with an

authorized capital of $10,000.   On the same day the stock-holders met and authorized an increase in capital to $600,-000, half common and half preferred, authorized the taking over of the Ashwell option, and the sale of 8,000 shares of its preferred stock, to provide funds for the sinking of the shaft, etc.

On November 20, 1901, John A. Russell, vice president of the Michigan Rock Salt Company, wrote the following letter to Currie:

"DETROIT, Nov. 20, 1901.
"GEORGE E. CURRIE, Esq.;
"Detroit, Mich.
"I enclose herewith a copy of Mr. Ashwell's specifications for shaft sinking.  The form of contract which he offers is the ordinary simple form, referring to the specifications and drawings and making them a part of the contract, the contract itself simply providing for the full purchase price.
"Yours truly,
"JOHN A. RUSSELL."

It appears that at the same time a draft contract was sent to Currie by Russell, as follows:

"This agreement, made and entered into this thirtieth day of November, 1901, between the Michigan Rock Salt Company, a corporation having its office and place of business in Ecorse, Wayne county, Michigan, party of the first part, and George E. Currie, of Detroit, Wayne county, Michigan, party of the second part, witnesseth: That the said party of the second part, in consideration of the agreement of the said party of the first part herein contained, hereby covenants and agrees to and with the above named Michigan Rock Salt Company, party of the first part herein, that he will at his own cost and expense furnish all the labor and such materials as may be required therefor, and in accordance with the plans and specifications designated as contract No. 1 for the sinking of a shaft for a rock salt mine in Ecorse township, Wayne county, Michigan, within the time and in the manner herein provided, for the sum of one hundred twenty thousand ($120,000.00) dollars, being at the rate of one hundred fifty ($150) dollars of shaft sunk, per foot, and no

greater price than one hundred and fifty dollars per foot shall be paid for any additional depth.

"The said contract shall be done in a substantial, thorough and workmanlike manner, and in all respects in accordance with and as specified and required in and by the plans and specifications of the said Michigan Rock Salt Company, hereto attached and forming a part of this contract, and the materials used shall be of the kind and quality named and required in said plans and specifications.

"Said contract shall be fully performed and completed in the manner herein required on or before the expiration of twelve months from the date of this contract. Said plans and specifications being attached hereto and dated of even date herewith, and signed by the president and secretary of the said Michigan Rock Salt Company, and a duplicate copy hereof signed by the party of the second part hereto. In witness whereof, the party of the second part has set his hand hereto, and the said Michigan Rock Salt Company has caused this instrument to be subscribed by its president and secretary, this 30th day of November, 1901, and its corporate seal to be attached thereto.

"[Signed]_____[L. S.]
"Michigan Rock Salt Company.
"By_____President.
"By_____Secretary.

"Examined and approved, Detroit, November 30th, 1901.

"[Signed]_____Engineer.

"Examined and approved as to legal sufficiency and correctness, Detroit, November 30th, 1901.

"[Signed]_____Attorney."

The specifications accompanying this contract were very full; we call attention to but a few sections:

"Instructions.—The contractor must follow strictly without delay, all instructions and orders given by the engineer in the performance of his work.   *   *   *

"Compressors.—The company will provide free of expense to the contractor, an air compressing plant, of adequate capacity, for his use during the progress of the work herein specified, etc.

"Security.—As security for the proper performance of the work, a bond acceptable to the company of an amount

equal to the full amount of the contract, will be required, and the company will pay at the times specified, only ninety (90) per cent. of the monthly estimates of the work properly performed and materials furnished, after deducting all charges against the contractor, retaining the ten (10) per cent. until the completion of the contract and the final acceptance of the work. The cost of the bond shall be paid by the company."

Prior to and during the month of November, 1901, subscriptions had been solicited to the preferred stock of the Michigan Rock Salt Company by those interested in its promotion. As a result some 3,600 shares of a par value of $25 each were subscribed. The first seven subscriptions were as follows:

| | |
|---|---:|
| John A. Russell | 400 |
| Wm. H. Ashwell | 100 |
| Geo. N. Skinner | 120 |
| Geo. N. Skinner, trustee | 480 |
| M. I. Sullivan | 120 |
| Geo. E. Currie (subject to tender of December 1, 1900) | 480 |
| Ralph Loveland | 200 |

Desiring to interest other capitalists in the enterprise, it was, on November 23, 1901, arranged between Russell and Currie that Currie should at once go upon the lands of the company and commence work upon the shaft, so that when prospective investors were taken to the site it would be found that work was actually in progress, and that the project was feasible. The expense of this preliminary work, amounting to $57.94, was personally guaranteed to Currie by Russell. This was the situation on November 30, 1901, when an inspection trip was arranged, so that intending investors might see the property. Among those who went upon this trip were Currie, Russell, Ashwell, Williams, Skinner, and Griffin. Currie testifies that defendant Loveland was likewise of the party. Loveland denies that he was present. Skinner likewise swears that Loveland was not present, and Russell and Williams state that they cannot recall the presence of Loveland upon

that occasion.   This action is predicated solely upon what
is alleged by Currie to have occurred between himself and
defendant Loveland at that time.

Currie testifies:

"After we got down to the place where we commenced
operation, they looked around a while and then these gen-
tlemen, Mr. Loveland, Mr. Russell, Mr. Skinner, and Mr.
Williams, gathered in a little knot, probably 60 or 75 feet
from the shaft, and after they had that conversation Mr.
Loveland came over to me and said they had decided to
have me go right ahead with the work, and he said, 'We
will personally be responsible for what you do here until
we notify you to stop,' and on that assurance I stayed
there."

On the afternoon of the same day on which this alleged
conversation took place, a meeting of the directors of the
Michigan Rock Salt Company was held, at which were
present directors Ashwell, Loveland, Russell, Williams,
and Skinner.   At this meeting resolutions were adopted:

(1) Authorizing the hiring of W. H. Ashwell & Co. as
engineers.

(2) Directing the delivery of the bonds of the company
for a deed of the company's land.

(3) Authorizing the negotiation of leases.

(4) Directing a call to be made upon preferred stock
subscribers for an installment of 25 per cent.

(5) Defining the policy of the company.

(6) "*Resolved:* That the tender of George E. Currie
for the sinking of a shaft for the mining of rock salt from
the company's property be, and the same is hereby, ac-
cepted, and that the president and secretary be instructed
to enter into a contract with him for the execution of the
work under the plans and specifications of William H.
Ashwell & Co., the said contract to be for the sum of
$120,000 for the sinking of a shaft 800 feet in depth, and
to provide explicitly that for any greater depth sunk, the
contractor shall receive payment at the rate of $150 per
foot, and no more."

Currie continued to work upon the shaft to June 28,
1902, when, without orders from anybody, he abandoned

it because of nonpayment for work performed.   During this period he was paid by the Michigan Rock Salt Company, upon estimates furnished by W. H. Ashwell & Co., engineers, the following sums:   January 18, 1902, $800; January 21st, $1,000; January 24th, $1,000; February 15th, $500; February 18th, $300; February 19th, $200; February 10th, $750; March 8th, $400; April 26th, $300; June 5th, $250; June 7th, $200; and June 28th, $750.

The method of payment is illustrated by Exhibit 6 which follows:

"DETROIT, MICH., Jan. 17th, 1902.   No. 1.
"THE FIRST NATIONAL BANK OF DETROIT:
"Pay to the order of George E. Currie ------ $800.00.
"Eight hundred dollars.
"Michigan Rock Salt Company,
"By EMORY WENDELL, Treasurer.
"JOHN A. RUSSELL,  Vice President."

Indorsed on back as follows:   "Geo. E. Currie."
Stamped:   "Paid, Jan. 18, 1902."

"DETROIT, MICH., Jan. 17, 1902.
"MICHIGAN ROCK SALT COMPANY,
"To GEORGE E. CURRIE, Dr.
"Jan. 17, 1902.
"On account of estimate for construction of shaft, $800,00.
"Correct: THOMAS E. GRIFFIN, Secretary.
"Approved: JOHN A. RUSSELL, Vice President.
"$800.00.   Received Jan. 17, 1902, from Michigan Rock Salt Company, eight hundred ($800) dollars.
"GEORGE E. CURRIE."

Indorsed on back:

"Check No. 1.   Voucher No. 1.
"Michigan Rock Salt Company.
"Name:  GEORGE E. CURRIE.
"Date, Jan. 17, 1902.
"$800.00.   Chargeable to shaft sinking, $800.00."

On January 23, 1902, Currie wrote the following letter:

"Office of GEO. E. CURRIE,
   "GENERAL CONTRACTOR,
      "1250 JEFFERSON AVENUE,
                     "DETROIT, January 23, 1902.
"MICHIGAN ROCK SALT CO., City.

   "*Gentlemen:* We are now ready to use the steam air compressing plant which you have agreed to furnish for the prosecution of the work of shaft sinking. We are operating a pump at a depth of 60 feet with steam and have no way of purifying the air in the shaft, where the fumes of sulphur are so strong that it is difficult for the men to work in the shaft at present.

   "In about three days we will reach the rock and it will be impossible to do any drilling without compressed air. I have three Sergeant drills on the ground and have an organized force of men and am prepared to prosecute the work vigorously, but can do absolutely nothing until you comply with your part of the agreement.

                     "Yours respectfully,
                        "GEORGE E. CURRIE."

   On February 20, 1902, he again wrote:

                     "DETROIT, Feb. 20, 1902.
"MICHIGAN ROCK SALT CO., City.

   "*Gentlemen:* I find it absolutely impossible for me to continue the work of sinking shaft unless I receive my pay as fast as the work is done. I have built 72 feet of shaft with 12-inch wall which would amount to $10,-800.00, and 80 per cent. of it, the amount I should have received, amounts to $8,640.00. On this amount I have received $4,550.00, which leaves a balance due me of $4,090.00.

   "In addition to this I have relined about 60 feet of the shaft. In consideration of relining the shaft down to the rock, I was to be permitted to build a shaft 12 feet in diameter inside, all the way down in lieu of 15 feet as originally intended.

   "If I am compelled to stop work through lack of funds I will expect to be paid for this extra work at a price to be agreed upon between your engineer and myself. Unless I receive the $4,090.00 on or before Saturday, February 22nd, I shall be compelled to stop work on that date and will hold you responsible for all losses occasioned by suspending work.

"Trusting you will take immediate steps to avoid this inconvenience, I am,

"Yours respectfully,
"GEO. E. CURRIE."

After this letter was written the company made five payments to Currie, amounting to nearly $2,000, but as the work continued the balance in his favor grew larger until, in June when he quit, it amounted to some $7,000.

On November 14, 1902, Currie wrote:

"Office of GEORGE E. CURRIE,
   "GENERAL CONTRACTOR,
      "1250 JEFFERSON AVENUE.
            "DETROIT, MICH., Nov. 14, 1902.
"MICHIGAN ROCK SALT CO., City.
   "*Gentlemen:* Unless we can adjust the amount of your indebtedness to me and make a satisfactory settlement in the very near future, I will be compelled to bring suit to get a settlement.
            "Yours respectfully,
               "GEO. E. CURRIE."

Soon after the writing of this letter, Currie claims to have written letters to defendant Loveland and to Skinner, Russell, and Williams, demanding payment. He kept no copy of the letters, and their receipt was denied.

The account for the labor and material furnished by Currie for this work was carried upon his books under the caption "Michigan Rock Salt Co., Shaft Contract."

After the abandonment of the work by Currie, matters seem to have remained stationary for more than three years, when, on July 22, 1905, this suit was commenced.

At no time during the progress of the work did Currie advise defendant Loveland of its condition, or demand payment therefor as it became due. On the contrary, he presented his estimates to Mr. Russell, the vice president of the Michigan Rock Salt Company, and continually urged that company to respond by paying. He did the work according to the plans and specifications prepared by the engineers of the Michigan Rock Salt Company and accepted the estimates of those engineers.

It will be remembered that the specifications required Currie to give a bond for the faithful performance of the contract, which was to be paid for by the company. Attempting to comply with this provision, Currie made written application for such bond. The company applied to, having refused to issue it, he executed a personal bond to the Michigan Rock Salt Company and himself secured the signatures of sureties thereon. The specifications likewise required the company to furnish, at its own expense, an air-compressing plant for Currie's use during the progress of the work. After he had been at work nearly two months and had earned, according to the terms of his contract, $9,000, he wrote the letter of January 23, 1902, to the Michigan Rock Salt Company calling attention to the fact that he was ready for the air compressor and stating that:

"I am prepared to prosecute the work vigorously, but can do absolutely nothing *until you comply with your part of the agreement.*"

Every act of Currie's from November 30, 1901, to November 14, 1902, is inconsistent with his claim that he had a contract with defendant Loveland, and is entirely consistent with the fact that he had, or believed he had, or expected to have, a contract with the Michigan Rock Salt Company, and did the work in question in reliance thereon. It is the claim of the defendant that the plaintiff, who is the assignee of Currie, and is in no better position than he, should be held to be estopped from recovery by reason of Currie's own acts, as to which there is no controversy upon this record.

Estoppel is a bar which precludes a person from denying the truth of a fact which has in contemplation of law become settled by the act of the party himself, express or implied. If one's conduct induces another to believe in the existence of certain facts, and the other acts thereon to his prejudice, the former is estopped to deny that the state of facts does in truth exist. 16 Cyc. p. 680, and cases there cited. Bigelow on Estoppel (5th Ed.), p. 570.

Applying this familiar principle to the facts disclosed by this record, we are of opinion that it must be said that Currie, and therefore the plaintiff, is estopped from denying that the labor performed and material furnished were performed and furnished for the Michigan Rock Salt Company. It must be borne in mind that defendant Loveland was a director in the company, and that as such director the course of Currie's dealings with the company were within his knowledge. If the alleged conversation of November 30th actually occurred (a matter which we will discuss later), Currie's own acts thereafter were such as to lead Loveland to believe that he (Currie) was proceeding with the work, relying upon the resolution of that date awarding him the contract, rather than upon the conversation. Currie never notified him of his obligation under the conversation, advised him of the progress of the work, nor demanded pay from him during its progress. He went on, expending nearly $15,000, without one word of warning to the man he now claims to be liable for this large sum, and by his conduct leading that man to believe that the company, not himself, was held by him (Currie) to be responsible. He will not now be permitted to deny the legal effect of his own acts. *Maxwell* v. *Bridge Co.*, 41 Mich. 453 (2 N. W. 639); *Pearson* v. *Hardin*, 95 Mich. 360 (54 N. W. 904); *Peninsular Stove Co.* v. *Osmun*, 73 Mich. 570 (41 N. W. 693); *Fifth Nat. Bank of Grand Rapids* v. *Dunham*, 109 Mich. 23 (66 N. W. 870); *Schmoltz* v. *Schmoltz*, 116 Mich. 692 (75 N. W. 135); *Barnard* v. *Patterson*, 137 Mich. 633 (100 N. W. 893); *Great Western Smelting, etc., Co.* v. *Evening News Ass'n*, 139 Mich. 55 (102 N. W. 286); *Scripps* v. *Sweeney*, 160 Mich. 148 (125 N. W. 72).

Again, assuming that the conversation occurred, Did the minds of the parties meet in such manner as to produce a legal contract? It is unquestioned that the amount of work to be done by Currie and its cost to Loveland was not agreed upon. Currie himself testifies that

he did not understand the undertaking of Loveland to extend to the entire contract of $120,000. He considered the arrangement merely temporary until the Michigan Rock Salt Company could so finance itself as to be able to take over the contract. At what time, or after how much work was performed, this was to be done, Currie was unable to state, and it is not claimed that Loveland fixed any time or amount. It would seem that the necessary elements of a valid contract are not present, though a conclusion to this effect is unnecessary, in view of our conclusions upon the question of estoppel. It is unnecessary to determine whether or not the conversation occurred on November 30, 1901, as alleged. It is sufficient to say that it is inherently improbable that defendant Loveland upon that occasion voluntarily undertook an obligation of such magnitude as the present demand indicates. The weight of the evidence is, in our opinion, against the alleged fact of its occurrence. It is, we think, clearly apparent from this record that Currie proceeded with the work, relying solely upon the credit of the Michigan Rock Salt Company, and that this situation continued until he found that credit exhausted, when he determined upon the course of action indicated by this suit.

The judgment is reversed, and a new trial ordered.

BIRD, McALVAY, BLAIR, and STONE, JJ., concurred.