JULIA A. BURT ET AL. v. RICHARD MASON AND FRANK H. VAN CLEVE.

*Mental competency—Estoppel—Fraud.*

1. Children who permit a third person to purchase land of their father in the belief that he is mentally competent, and without any knowledge or information to the contrary, are estopped from asserting his incompetency in a suit brought by them as his heirs to set aside the deed on that ground.

2. No legal or moral obligation rests upon the proposed purchaser of land to inform the owner of the prospective construction of a railroad to a point near the land, or that he is making efforts to induce the building of such road.

Appeal from Delta.   (Stone, J.)   Argued April 26, 1893. Decided October 13, 1893.

Bill to set aside a deed. Decree dismissing bill affirmed. The facts are stated in the opinion.

*Clark & Pearl (Alfred Russell,* of counsel), for complainants.

*Ball & Hanscom* and *F. D. Mead,* for defendants.

GRANT, J. The bill in this case was filed by the heirs of John Burt, deceased, to set aside a deed executed by him June 3, 1885, to defendant Van Cleve, as to those portions of the land the title to which is still in defendants, and for an accounting as to those parts which they had sold. The land is situated on what was then known as "Saunder's Point," now a part of the village of Gladstone, on Little Bay de Noquet, an arm of Green Bay, and consists of lots 2 and 3 of section 22, town 40 north, range 22 west.

John Burt located and purchased this land from the United States in 1851, in anticipation that what is now the Chicago & Northwestern Railroad might be built to this point. It was instead built to Escanaba, a point several miles below. The land was a sand plain, had no timber, and was valueless unless utilized as a shipping place in connection with some railroad. It had cost Mr. Burt but little, and after the location of the railroad at Escanaba he evidently recognized that it was of no value, for he paid no taxes on it, nor did his heirs after his death, in 1886. He did not record his patent, which was issued December 1, 1851, and it appears by the record to have been recorded August 26, 1887. It was sold for taxes, and a tax deed executed to Mr. J. N. Hiller, February 9, 1864, who bid the land off at the tax sales for the next ten years, and then paid the taxes till he sold it, in 1880. Mr. Hiller leased the lots for a lumber camp in 1866 or 1867, and it was used for that purpose for three

or four years, and was then leased for fishing purposes. A log shanty had been erected, which was occupied by the fishermen.

The defendants lived at Escanaba.    Mr. Mason was not acquainted with Mr. Burt or his family, but supposed that Mr. Burt was dead. Early in the spring, probably in March, Mr. Mason wrote a letter directed to the heirs of John Burt, at Marquette, calling attention to this land, and offering $50 dollars for it. Hiram A. Burt, a son of John, was then living in Marquette, and had a power of attorney from his father to attend to his business in the Upper Peninsula. In his absence, William Burt, a brother of John, and then living at Marquette, was instructed by Hiram to receive and open his mail, to use his own judgment as to what he should do with it,—either attend to it himself or forward it. William received this letter during Hiram's absence in Chicago, read it, and then forwarded it to John Burt, who then lived in Detroit. After several weeks, Mr. John Burt wrote to Mason, accepting his offer, and requesting him to send a quitclaim deed for execution. Mr. Mason sent a draft for $50, and a deed, as requested. He received the deed, properly executed by Mr. Burt and his wife, June 6, 1885. It bore date May 30, and was acknowledged June 3.

It is contended that Mr. Burt was incompetent to execute the deed, and that the letter written by Mason contained false and fraudulent representations as to the value of the land. The bill alleges that the defendants had knowledge of the great value of this land as a prospective terminal point for a railroad, on account of the fine natural harbor there located, and that certain railroad companies were looking to this place as a terminal point. It then sets forth the false and fraudulent representations in the following language:

97 Mich.—9.

"And your orators further allege that the defendants, having knowledge of the great value of said property, as above set forth, but fully believing in the total ignorance of the deceased or of his heirs as to the value of said land, opened a correspondence with the deceased, representing to him, by such correspondence, that the land was of no value except as a place on which a fisherman could locate his fishing shanty for fishing purposes on the said Little Bay de Noquet, and that a fisherman had located his fishing hut upon the said land for years, and held tax titles upon the same, and that the said defendant Richard Mason (who was the defendant who carried on the correspondence) was authorized to offer for this fisherman $50 for a quitclaim deed of the title of the said deceased."

Complainants do not produce the letter, and account for this by evidence that it was not found among the papers of Mr. Burt after his death. Four persons on the part of the complainants testify in regard to its contents, viz., William Burt, Mr. Leete, a son-in-law, Mrs. Leete, a daughter, and Julia A. Burt, the widow of John. William Burt, after testifying to his authority from Hiram and the receipt and reading of the letter, testified as follows:

"Q. Now, what were the contents of the letter? What was the subject of the letter,—what was it about?

"A. The letter was about some land.

"Q. Where?

"A. At Saunder's Point, near Escanaba.

"Q. What did he state, if anything, that he desired with regard to this land that you have referred to?

"A. He desired to get a quitclaim deed.

"Q. What did he say about getting a quitclaim deed?

"A. He offered $50 for a quitclaim deed of this land.

"Q. Do you know whether it was land that John Burt at that time owned?

"A. I knew he had owned it.

"Q. Now, did Mr. Mason in this letter give any reason for making this offer for a quitclaim deed that you have mentioned?

"A. Yes, sir.

"Q. What did he say?

"A. He said there was a tax title on it.

"*Q.* Did he mention any particular men or class of men?

"*A.* Fishermen, I think. He spoke of a fisherman occupying it.

"*Q.* And having tax titles?

"*A.* Yes, sir.

"*Q.* Did he state why he made this offer when there were fishermen occupying this land and held the tax title?

"*A.* The language was such that I thought he wanted to buy it for the fisherman.

"*Q.* Did he say who authorized him, or whether anybody did authorize him?

"*A.* The language was such that I thought it was for the fisherman; that was my construction of the language.

"*Q.* And led you to believe from the letter that he was authorized by the fisherman to make the offer of $50?

"*A.* Yes, sir; that was the idea I had from it,—from the language of the letter.

"*Q.* Can you give on that point the exact language as used?

"*A.* I cannot; he said it was occupied as a fishing station.

"*Q.* Now, is there anything else you recollect in regard to what was the object and purpose of making this offer, or how he came to make it?

"*A.* No, sir; nothing more than I have said."

Mr. Leete testified that he brought the letter containing the draft and the quitclaim deed to Mr. Burt; that Mr. Burt opened the letter, and gave him the draft to deposit; that he did not remember from whom the letter purported to be; that Mr. Burt gave him the letter afterwards to read in explanation of the draft; that his recollection was that the letter contained a quitclaim deed ready to sign. The witness, being asked to state the contents of the letter as well as he could remember, replied:

"Well, the letter went on to say that this party, a fisherman, that was located on this land, wanted the land for a fishing station, and the land was valueless for anything else, and recommended his selling at that figure."

The witness, both on his direct and cross examination, referred to the letter containing the draft. On redirect

examination he testified that Mr. Burt received two letters in regard to this land,—one addressed to the heirs of John Burt, and the other to Mr. Burt himself. It is not claimed that the second letter contained any such representations as the witness testified to. It may be that this witness is confused in regard to these letters, but he does not testify that he ever read the first letter.

Mrs. Leete neither saw nor read the letter, but testified that Mr. Burt explained to them that a letter had come, saying that a fisherman had occupied the land for some time, and "would like to have the tax title for a certain sum of money; that he would settle up the tax titles for a certain sum of money."

Mrs. Burt, the widow of John, testified that her husband read the letter to her. Being asked if she could remember what was stated in the letter, she replied:

"It was a point that was not very valuable, and was occupied by an old fisherman, and there was a tax title on it.

"Q. Did the letter state who wanted the property, who wanted to get the deed; do you remember?

"A. No, I cannot say as to that."

The above is all the testimony on which to base a claim of fraud in the contents of this letter.

Mr. Mason is the only other person who had knowledge of its contents. Defendant Van Cleve knew nothing about the letter until after Mason had received the letter from Mr. Burt accepting the proposition. Mr. Mason kept no copy of the letter. His statement of its contents is as follows:

"I stated that the land had been sold for taxes, giving the years for which it had been sold, which I think was in 1863 or 1864, and that the land was subject to that tax title and all the subsequent taxes; that no taxes had been paid by Mr. Burt since that time; and, I think, making them an offer of $50, subject to these tax titles, for a quitclaim deed of the land,—either that or asking

them what price they would take for it, subject to those tax titles."

This testimony utterly fails to establish a case of fraud on the part of Mr. Mason. William Burt does not testify that the letter contained any representations as to value. The statement that it was occupied by a fisherman was true. Gustave Nelson, a fisherman, a witness for the complainants, testified that he occupied it for that purpose for six years from the 7th of September, 1881, and that Ole Gunderson had occupied it a year or two before him. Mr. Gunderson, also a witness for complainants, testified that he occupied the place for fishing for four summers, commencing in 1875 or 1876. The representations as to the tax title were true. Mrs. Leete testified to no representation except that a fisherman had occupied the land for some time, and that he would like to have the tax title for a certain sum. Mr. Leete is the only witness who testified to any tangible representations as to value, and, as already shown, it is doubtful if he had read the letter. But, if his version be taken as the true one, the statement was true. The land was valuable for no other purpose, unless it became a shipping point by the construction of a railroad. As expressed by one of the counsel for the complainants in examining a witness, "this land, like all other along the west shore of the Little Bay de Noquet, had at this time merely a 'speculative future.'"

The pleadings in this case, and the long record, are largely taken up with the history of the construction of the railroad from Minneapolis to Sault Ste. Marie, and which was finally located and constructed to Gladstone. It would be of no profit to the bench or bar to enter into a detailed statement of this history. It is sufficient to state that at the time this letter was written, and at the time the deed was received, the road had not been located. There was no certainty that it would come to this point,

or to any other on Little Bay de Noquet. There were two other available places where there were good harbors, especially Day's River, a few miles above Saunder's Point, and also Masonville, situated near the head of the bay. At these places Mr. Mason had larger interests than at Saunder's Point, and would have been much more greatly benefited by the construction of a road to Day's River. It was not until after this deed was received that the representatives of the proposed railroad went to Escanaba, procured a tug, and examined the shores and waters of Little Bay de Noquet, Big Bay de Noquet, and the northern shore of Lake Michigan with the view to determine whether they would build to the ·lake, and, if so, to what point. After they had done this, verbal propositions were made, which were finally reduced to writing, by which it was agreed that certain lands, including portions of that here in controversy, owned by these defendants and other parties, should be deeded to the railroad company, in consideration of the construction of the railroad to Saunder's Point. This arrangement was carried out, docks and warehouses were built partly upon this land; and not until after all this had been done did the complainants take any steps to set this deed aside.

As already shown, the defendant Mason made no false or fraudulent assertion of existing facts. Neither did he conceal any material facts which he was under any legal or equitable duty to communicate to Mr. Burt. No legal or moral obligation rested upon him to inform Mr. Burt that there was talk, or even a prospect, of a railroad coming to this point, nor that he was making efforts to induce the building of one. In all other respects, Mr. Burt knew the situation as well as defendants.

We deem it unnecessary to state or discuss the evidence with regard to the incompetency of Mr. Burt. We think it fails to establish a want of mental capacity required to

comprehend and execute the deed; but there is another ground upon which the relief asked may safely be denied as to all except Alvin. The complainants in this case trusted their father with the management of certain of his affairs. All of them, except Alvin, who is not a witness, must be charged with knowledge of this transaction, especially under the facts of this case. Mr. Mason was dealing with Mr. Burt "at arm's length." Both Mr. Burt and his children had ample time to investigate; nor does it appear that Mr. Burt did not investigate, for it was some weeks before he replied to the letter. Mr. Mason had the right to act upon the presumption of competency. He had no knowledge or information, nor any reason to suspect, that Mr. Burt was not competent. Mrs. Burt signed the deed with her husband; his daughter witnessed it. By Hiram's authority the letter was placed in his father's possession to deal with and answer. They knew that Mr. Mason was dealing with Mr. Burt in the belief that he was competent. These acts on their part amount to an assertion, so far as this transaction is concerned, that he was competent, and now estop all the complainants except Alvin to assert to the contrary. Moreover, these acts are the most persuasive evidence of his competency.

The decree is affirmed, with costs.

The other Justices concurred.