ROTH *v.* RUBERT.

1. EQUITY—JURISDICTION—ADEQUATE REMEDY AT LAW—MULTIPLICITY OF SUITS.

Where complainants filed a bill to enjoin certain defendants from prosecuting their appeals from the allowance of claims filed against the estate of a decedent, and the point was first raised on appeal to the Supreme Court that the complainants' remedy was at law, and where the controversy had been heard and determined by the judge of the circuit court in chancery and if the complainants were remitted to the law side of the court several suits were likely to arise, jurisdiction is retained by the court to dispose of the alleged equitable estoppel relied on by complainants.

2. ESTOPPEL—EQUITABLE ESTOPPEL—RATIFICATION.

If a person by words or conduct intimates that he consents to an act and will offer no opposition to it, although it could not have been lawfully done without his consent, thereby leading others to change their position or relinquish rights which they might have enforced, he will not afterwards be permitted to question the legality of the act which he has sanctioned.

3. SAME—EVIDENCE—COMPROMISE AND SETTLEMENT.

Evidence considered, and *held*, to estop defendant from

denying that her assignor assented to a compromise of his interest in decedent's estate and of claims presented against it.

Appeal from Livingston; Miner, J. Submitted January 9, 1913. (Docket No. 25.) Decided July 18, 1913.

Bill by Catherine Roth and others against Elizabeth Rubert to enjoin appeals of defendant from the determination of commissioners on claims in the estate of David Robison, deceased. From a decree granting partial relief, both parties appeal. Modified and affirmed.

*William P. Van Winkle* and *Louis E. Howlett,* for complainants.

*Shields & Shields* and *James A. Greene,* for defendant.

KUHN, J. In this cause the court of chancery is resorted to for the purpose of preventing the prosecution of two appeals from the allowance of claims by commissioners on claims in the probate court. David Robison, a bachelor, died in 1911, leaving an estate of about $27,000. Living with him at the time were Mary Cummiskey, a niece, who acted as his housekeeper, and James La Grange, his nephew. His heirs at law are: Two sisters, Catherine Roth and Jane Dunn; Mary Newman, Adela Fields, and Catherine Leedle, daughters of a deceased brother; James La Grange, son of a deceased sister; and William Robison, son of a deceased brother—all of whom were over 21 years of age. Administration of the estate having been begun, it became apparent that several large claims for services would be presented to the commissioners on claims, who had been appointed. James La Grange, Mary Cummiskey, and Catherine

Roth claimed to have performed services for Robison during his lifetime and La Grange claimed to have let his uncle have some of his money. In order, if possible, to avoid litigation, an attempt was made among the heirs to effect an amicable adjustment of these claims.

A petition having been filed to have James La Grange declared an incompetent person, and for the appointment of a guardian, a meeting of the heirs was arranged by Mr. L. E. Howlett, an attorney representing one of the claimants and several of the heirs. A meeting was held in his office on the 31st day of January, 1912, at which meeting there were present Catherine Roth, George Roth, her husband, Mary Newman, George A. Newman, her husband, Adela Fields, William Robison, and Mr. Howlett. At this meeting, it is claimed, a settlement was discussed, which was to result, after paying the claims, in each sister and the family of each deceased brother and sister receiving the sum of $3,000 from the estate. Another meeting was arranged for February 2, 1912, and before leaving the office it is claimed that William Robison stated that it would be impossible for him to be present on that date, but that any arrangement by Mr. Newman, who was to attempt to bring about the settlement, would be satisfactory to him, if agreeable to the other interested parties. A meeting of all the parties in interest, with the exception of William Robison, was had, and resulted in an agreement in writing being entered into, by which Catherine Roth's claim was to be allowed at $500, James La Grange's claim at the sum of $5,300, and Mary Cummiskey's claim at the sum of $5,300, and also provided for the complete distribution of all of the estate so that each interest would receive the sum of $3,000, as proposed in the meeting of January 31st. William Robison's name was signed to the paper by Mr. Geo. Newman, under the claimed authority received at the meeting

of January 31st. The commissioners on claims met on February 8, 1912, at which meeting William Robison was present, and the agreement in writing was presented to the commissioners, read to them, and a request was made to have the claims allowed as agreed upon. As no proofs were offered in support of the agreement, upon objection being made by Mr. Shields, an attorney representing the administrator, the meeting was adjourned until February 13th, at which time formal proofs were made to support the claims, and they were allowed according to the agreement. Defendant Elizabeth Rubert claims to be the assignee of the interest of William Robison in the estate, and as such filed claims of appeal in the allowance of the Roth and Cummiskey claims. The circuit court restrained the prosecution of the appeal in the Roth claim, but denied the relief prayed for as to the Cummiskey claim, and both complainants and defendant have appealed.

It is claimed that William Robison, by his conduct subsequent to February 2, 1912, ratified the written agreement of that day, and that because of his conduct Mrs. Rubert, his assignee, should be estopped from prosecuting the appeals. On the part of the defense it is claimed that at the time it is urged that William Robison ratified the agreement he did not know all the facts concerning these claims, and that he learned, subsequent to that time, from Mr. Rubert that Mary Cummiskey had been paid sums of money by David Robison for her services, and had made a settlement with him some years previous for $1,750, and she, having since deceased, left an estate of $10,000, or more, and that she must have received this property from her uncle, as she had no other source of income. He also claims that he learned that the Roth claim had been barred by the statute of limitations.

The theory upon which relief is sought being that

the doctrine of equitable estoppel should be applied, and the assignee of William Robison's interests be prevented from prosecuting the actions at law, the point is made that the equity court is without jurisdiction, because the doctrine of estoppel relied upon by complainants could be urged in the suits at law in support of the claims. Adjustments of controversies arising out of the settlement of an estate have been, and should be, favored by the court. Those interested in the claims and in the residue were all of kin, and if no adjustment had been arrived at, protracted and expensive litigation, it is fair to assume, would have resulted. If the jurisdiction of the chancery court is denied, several suits will have to be tried; and, in view of the fact that the matter has already been determined by the trial court, and is now before us for final determination so as to avoid multiplicity of suits, we feel constrained to hold that the controversy is properly within the jurisdiction of the equity court.

Did William Robison ratify the agreement of February 2d by his conduct subsequent thereto? It is undisputed that on February 8th, when the parties in interest appeared before the commissioners on claims, he was present and heard the agreement read and the claims argued. His own version of what occurred is shown by his testimony, as follows:

"*A.* I heard Mr. Van Winkle read this agreement to those commissioners; heard him argue to the commissioners that these claims ought to be allowed because the heirs had all agreed upon the amounts. I did not hear Mr. Howlett make the same statement; I didn't say anything to the commissioners in opposition to it. I kept still all day; went home at night. I did not tell the commissioners that day, or anybody else, that I objected to allowing those claims; I didn't think that I needed to. Mr. Shields made the objection, and I didn't think there was any need of me. I supposed they would have to be sworn in anyway. I suppose I was opposed to those claims that day; I

didn't tell that to anybody. I didn't suppose I had to. I never told anybody before April 17th that I was opposed to those claims. I was not here February 19th, when Mr. Roth and Barney Cummiskey were sworn. I knew there was an adjournment made to the 19th to hear those claims; I was opposed to them, but I didn't come near the meeting. I didn't suppose I had to. I did not call up anybody and talk about the claims. I did absolutely nothing."

The claimants who were presenting their claims were relying upon the agreement and he heard his name read as having signed, nevertheless he remained silent and raised no objection, and did not attend the adjourned meeting, although he knew its purpose. If at the times the claims were presented and allowed he had raised objection to the agreement, in all probability the claims would not have been presented at the amounts that they were, as the amounts agreed upon were the result of compromise in settlement.

Mary Cummiskey having died since the allowance of the claims, Mrs. Roth lost an important witness, and it is urged, with some force, that the representatives of Mary Cummiskey's estate are in a less favorable situation with reference to that claim in case of contest, as they have not the same knowledge of the facts and circumstances surrounding the claim and the location of testimony to support it as she had. Having remained silent when he should have spoken, he should not now be heard to complain when, as a result of his remaining silent, he placed the claimants in a less advantageous position with reference to their claims if a contest should now be permitted. The rule of law applicable to his conduct is well stated in the case of *Truesdail* v. *Ward,* 24 Mich. 117, 134:

"It is a universal law that if a man, either by words or by *conduct,* has intimated that he consents to an act which has been done, and that he will offer no opposition to it, although it could not have been lawfully done without his consent, and he thereby

induces others to do that from which they otherwise might have abstained, he cannot question the legality of the act he had so sanctioned, to the prejudice of those who have so given faith to his words, or to the fair inference to be drawn from his conduct."

See, also, *Michigan Paneling, etc., Co.* v. *Parsell,* 38 Mich. 475; *Peake* v. *Thomas,* 39 Mich. 584; *Heyn* v. *O'Hagen,* 60 Mich. 150 (26 N. W. 861); *Burt* v. *Mason,* 97 Mich. 127 (56 N. W. 365); *Miller* v. *Ross, Bradley & Co.,* 107 Mich. 533 (65 N. W. 562); *Dillon* v. *Craig,* 168 Mich. 216 (132 N. W. 1041); *Detroit Savings Bank* v. *Loveland,* 168 Mich. 163 (130 N. W. 678). William Robison was apparently satisfied with the settlement until he received information concerning the claims from Mr. Rubert. Mary Cummiskey is a sister of Mrs. Rubert, and their mother, Jane Dunn, is one of the parties to the contract and agreement.

The original petition for the appointment of guardian for James La Grange prayed for the appointment of Mr. Rubert as guardian, and on the day set for hearing this petition all the heirs, including William Robison, filed a written instrument asking that George Newman be appointed. The day after Mary Cummiskey's funeral we find William Robison at the Rubert home, and the assignment was made. William Robison relates how it was made, as follows:

"While at Seth's house the day after Maime's funeral, and the next day I claim to have assigned my interest in the David Robison estate to Mrs. Rubert; there were some papers prepared, and I signed them at Mr. Rubert's house. An attorney was called down there to the house, and I signed them down there. I don't know why I didn't come uptown to sign them. I think Mr. Rubert asked an attorney to come down there. I didn't sell out my interest for any amount. I didn't get any money at all, and haven't to this day, and have got nothing from Mrs. Rubert to show I have sold my interest in the estate except the promise. I have got a writing at home, a paper; haven't got it here; can't tell what it says. It said she would give

me all over and above $3,000, but I should have three thousand over and above. I should have $3,000, and half over and above that. I don't know how there is to be any above that. He told me if I were to assign this over, they would fight the claim for me. I didn't have the money; all they made out of it they were to split. I to have half and Mrs. Rubert half, and he is now fighting it for me. He hasn't paid me anything. I understand the day I made those papers that was the last day an appeal could be taken. I think the judge of probate told me that. I was in his office with Mr. Rubert two or three hours before these papers were signed. I think those papers were signed about 2 o'clock; think I was up to the judge of probate's office before dinner. Rubert took me up there to talk about something regarding this case, about appealing. Rubert said he would appeal for me; let me have the money to do the work; that he would appeal for me and furnish the money and go on my bond. Then in the afternoon that was changed, and I signed some paper, assigned it right over to Mrs. Rubert, and she made the appeal for me, and is now acting for me in this matter, I suppose."

By the agreement made William Robison did not get any money, and it provides that Mrs. Rubert shall prosecute this appeal, and in case the final distributive share of William Robison in the estate of his uncle, after deducting the expense of litigation, does not exceed $3,000 that Mrs. Rubert will then release and reconvey the property assigned. In case his distributive share exceeds $3,000 after deducting the expense of litigation it provides:

"Then the said parties hereto are to share equally in any and all excess or residue; that is to say, that the said Elizabeth Rubert shall duly assign, convey, and make over unto the said William L. Robison one-half of all such excess, the remaining one-half of the same to remain the individual property of the said Elizabeth Rubert."

It certainly can be claimed that this was an unfair arrangement and while William Robison is not complaining, nevertheless it is illuminating as showing

the relationship of the parties to this controversy. In no contingency, by the strict letter of this agreement, can William Robison profit. The motive of Mrs. Rubert in taking this assignment is explained in her testimony as follows:

"*A.* I have no desire only this, the desire I had; the deal with William Robison and myself I will admit, was a purely business transaction.

"*Q.* For what purpose?

"*A.* Why, it was just a business transaction between him and myself.

"*Q.* What was your motive in buying in there?

"*A.* My motive for buying in was, as I said, to get inside the ring. I was just outside, and was to get inside, to get inside so I could do something to see that was divided up; my mother would get what belonged to her."

It is claimed by William Robison that he had no knowledge of the settlement of Mary Cummiskey with David Robison by which she received $1,750 in settlement of her services up to that time. This settlement is claimed to have been made in the presence of Mr. and Mrs. Rubert, David Robison, and Mary Cummiskey.

Mr. Louis E. Howlett, the attorney, testified as to the conversations had in his office on January 31st, and stated that the proposed settlement was fully discussed in the presence of William Robison. With reference to Mary Cummiskey's claim he says the following occurred:

"Then the question came up of Mary Cummiskey's claim, and they all said she was asking too much, and they all said that, and they went on to tell the mortgages she had, and as they said Dave had given them to her, but George said they were matters of a private nature that he didn't want brought up, and if they were brought up it might sweep the estate, and he wanted it settled, and he said he thought if the heirs would take $3,000 apiece, and Mrs. Roth to have $500 more, that a settlement could be made; and Mrs. Roth

spoke up and said she would be glad to get $3,000 and he turned to Willie Robison, asking him if he would be willing; he said: 'Yes; that is more than I ever expected to get.' Then it was talked about how they would get together, and I don't just remember the talk, but George said he would get them all together in a couple of days; I don't know, maybe he set the date; I don't remember, but he asked Will Robison if he could come back, and he said 'No,' he couldn't keep running over here, that he was teaming it, and he turned to me, he says, 'Is it necessary for me to come back?' I said: 'No;' it wasn't necessary; 'you ought to come.' He said: 'You folks go ahead and get a settlement if you can; whatever the rest agree to I am willing to stand by.' * · * *

"*Q.* Mr. Howlett, after Willie Robison was present in your office on the 31st of January, I ask you whether or not he knew what it was claimed by different heirs that Mary Cummiskey had been paid upon her claim, if anything?

"*A.* Well, as to the exact amount in dollars and cents, I couldn't say, but I know that on that day Mr. Newman told of different mortgages that were recorded, either in Miss Cummiskey's name singly or jointly with Dave Robison, and he said in his opinion they had been given to her for services, and that he had been told that she was paid as they went along."

Mr. Newman testified as follows:

"It was talked to Willie Robison that the claims of Mary Cummiskey and James La Grange were somewhat around $5,000 or $6,000 at that time. I did not know just what the claim was at that time, and Mrs. Roth's was $500. And it was talked that there would be left somewheres around $3,000, as a distributive share for Will Robison, and for each of the others, $3,000 apiece for each of the five heirs. My wife and her two sisters would take one share, $3,000; Will Robison would take $3,000; Aunt Jane and Aunt Kate, each take theirs; and Willie Robison would take his $3,000 for his share.

"*Q.* What did Willie Robison say about taking the $3,000 for his share?

"*A.* At that time, I don't know as he said. He said

whatever we did, whatever settlement we came to would be satisfactory to him.

"*Q.* Was there some time before that, when he said what he thought about the amount he should get out of the estate and how much he expected to get?

"*A.* He didn't expect he would get anything.

"*Q.* Did he say so?

"*A.* Yes, sir; he said it was a surprise to him to get anything.

"*Q.* What did he say, if anything, about being satisfied with getting $3,000?

"*A.* He told me he was perfectly satisfied. He said he couldn't come over here on the 2d of February, or the day we agreed to come, because he was working, teaming it. I think Mr. Howlett said, 'Well, it won't be necessary, if these people can act for you.' And in reply to that he said 'Whatever they did is satisfactory,' and then we separated."

Adela Fields testified as to this conversation, as follows:

"First, we thought the claim that Mary Cummiskey put in was too heavy. I learned the amount of her claim through Mr. Van Winkle telling George Newman; I understood that Van Winkle was acting as her attorney in presenting the claim; I think her claim was $5,300. Jimmy La Grange's claim the same; Mrs. Roth's claim $500; that was the talk this day when we were all there. It was talked that Mary's claim was for services and housework there on the farm. It was discussed, as to whether or not she had ever been paid anything; some said she had been paid, and some said she hadn't. I think she had been paid in part anyway. There was a little talk there among us as to what property she had."

William Robison testified that the only subject he could remember being discussed at this meeting was "about Seth Rubert's being guardian," and did not think any other subject was discussed.

The trial judge in his finding states:

"I am of the opinion that Mr. Howlett and Mr. Newman stated the facts correctly."

If the testimony of Mr. Howlett is to be accepted as stating the facts, and we agree with the circuit judge that the testimony is convincing, it follows that Mr. William Robison, having heard the conversation in Mr. Howlett's office, knew about the mortgages that it is claimed Mr. Robison gave Mary Cummiskey. He was a visitor, two or three times a year, at Mr. Robison's home; during the last 20 years Mary Cummiskey was the housekeeper. As stated, sometimes he would stay there for a week at a time. We cannot agree with the contention that he was deceived at the time the settlement was arranged, as he must have known, from what he heard in Mr. Howlett's office, that Mary Cummiskey had considerable property, and that she had received it from her uncle, David Robison.

The temporary injunction restraining the prosecution of the appeal from the allowance of the claim of Mary Cummiskey should be made permanent, and in this regard the decree of the lower court will be modified; in other respects, it will stand affirmed, with costs to the complainant.

STEERE, C. J., and MOORE, MCALVAY, BROOKE, STONE, and OSTRANDER, JJ., concurred with KUHN, J.

BIRD, J. *(dissenting).* I am of the opinion that this injunction bill should be dismissed, and that the claims of Catherine Roth and Mary Cummiskey should be tried on their merits in a court of law in conformity with the statutory procedure. The showing made at the hearing to enjoin their prosecution in the usual manner is very convincing that neither claim has any merit. The Roth claim is admittedly outlawed, and was at the time it was presented to the commissioners, and should have been rejected by them, as the statute in express terms forbids the allowance of such claims against the estates of deceased persons. 3 Comp. Laws, § 9375. It appears by the

testimony of two witnesses who were in a position to know the facts that the Cummiskey claim had been paid in the lifetime of the deceased, and that instead of the estate being indebted to her, she was indebted to the estate. This testimony raised a strong suspicion against the honesty of the claim, and fully justified the chancellor in refusing to enjoin its prosecution. The answer of complainants to this is that all the parties in interest agreed upon a "compromise" of the claims against the estate, and therefore no one of them is in a position to prosecute an appeal from the decision of the commissioners in the circuit court. Willie Robison, whose assignee effected the appeal, signed no compromise agreement, nor did he authorize any one to sign it in his behalf. Neither the fact that the Roth claim was outlawed, nor the fact that the Cummiskey claim had been paid, was known to him when it is claimed he ratified the compromise agreement. If he were ignorant of these facts, he would not be bound by the compromise agreement. *Hurley* v. *Watson,* 68 Mich. 531 (36 N. W. 726); *Maxson* v. *Railroad Co.,* 117 Mich. 218 (75 N. W. 459); *Deffenbaugh* v. *Manufacturing Co.,* 120 Mich. 242 (79 N. W. 197); *Leonardson* v. *School District,* 125 Mich. 209 (84 N. W. 63); *Upton* v. *Dennis,* 133 Mich. 238 (94 N. W. 728); *Cowan* v. *Manufacturing Co.,* 141 Mich. 87 (104 N. W. 377).

An effort is made to discredit the testimony of the Ruberts on account of Mrs. Rubert's interest in the estate and for various other reasons. It is true they have a selfish interest to serve in defeating the claims, but it must be remembered that by reason of their nearness to Mary Cummiskey they were in a position to know the facts about which they testified. If, as is contended by counsel, this testimony is unworthy of belief, a jury in the circuit court will doubtless discover it, and give it such credence as it deserves. If the claims are honest ones, they should become a

charge against the estate on their merits, and not by estoppel.

To further discredit these witnesses counsel attacks the assignment of the claim of Willie Robison to Mrs. Rubert, and calls it unconscionable. The record shows that Willie Robison made an assignment of his interest in the estate to Mrs. Rubert, but it does not show that he has ever expressed any regret that he did so. He makes no complaint that he has been overreached, and asks no relief from this court on account of it, and there would seem to be no good reason why we should concern ourselves with a possible difficulty between these parties in the future.

The order of the chancellor dismissing the injunction as to the Cummiskey claim should be affirmed, and a like order should be entered in the Roth claim.

The defendant should recover her costs in this court.