## FURMAN *v.* BROWN.

CANCELLATION OF INSTRUMENTS—FRAUD—VENDOR AND PURCHASER
—EVIDENCE—SUFFICIENCY.

In a suit for the cancellation of a contract for the sale
of land on the ground of fraud, the decree of the court
below dismissing plaintiff's bill and granting defendants
specific performance of the contract on their cross-bill,
*held,* justified by the record.

Appeal from Muskegon; Vanderwerp (John), J.
Submitted January 16, 1924.    (Docket No. 75.)    De-
cided July 24, 1924.

Bill by Adelbert Furman against Edith J. Brown and
others for the cancellation of a land contract on the
ground of fraud.    Defendants Brown filed a cross-
bill for specific performance.    From a decree for de-
fendants, plaintiff appeals.    Affirmed.

*Edward C. Farmer (James E. Sullivan* and *George
H. Meyer,* of counsel), for plaintiff.

*Lovelace & Broek,* for defendants.

STEERE, J.    On February 19, 1921, plaintiff filed
his bill in this case asking cancellation of a land con-
tract given by him on December 4, 1919, to defendants
Edith J. Brown and Robert B. Brown, agreeing to sell
them 50 acres of land near the city of Muskegon for
the sum of $2,200 with a payment of $700 down,
and deferred payments of $100 every six months there-
after with interest at 6 per cent. per annum, payable
semi-annually, until the full purchase price was paid.
The grounds of complaint alleged are that he was
fraudulently induced to enter into the contract to sell
said land for a grossly inadequate price by false repre-

sentations made to him by defendants as to its value, of which he was ignorant at the time. Defendants answered in denial with cross-bill and prayer by defendants Edith and Robert B. Brown (mother and son) for specific performance of said contract. Defendant Arnold C. Rasmussen is a real estate dealer and agent in the city of Muskegon charged by plaintiff with having assisted defendant Edith Brown in the false representations and fraudulent inducements of which plaintiff complains. From a decree dismissing plaintiff's bill and granting specific performance of said contract to defendants Brown, plaintiff appeals.

Plaintiff is a Polish Catholic priest over 55 years of age, residing in the city of Chicago, where he pursued his pastoral calling for over 20 years last past and has frequently visited the city of Muskegon during his vacations and in connection with his pastoral work. In 1910 he purchased 80 acres of land adjoining the city limits at the westerly end of Muskegon for the purpose of providing a vacation recreation center for the sisters of his church and convent school, paying $1,500 therefor. The land was used for that purpose during several summers, but not being considered sufficiently convenient to the city of Chicago to be readily accessible, and an attempt to cultivate a cleared portion of it proving unsuccessful, the project failed and the land was allowed to remain idle thereafter. Plaintiff was desirous of disposing of the land and in 1916 or 1917 he sold 10 acres of it for $900 to one party and about 20 acres for $1,300 or $1,400 to another, leaving him approximately 50 acres, about 10 acres of which had been cleared up at one time. The soil was poor and the property not adapted to agricultural purposes, being hilly land with gulches or ravines cutting through it excepting a small cleared portion near which was located a pest-house or contagious disease hospital. In

1918 he had two large for sale signs set up on the property, one being opposite the South Shore Country Club. He only received two letters of inquiry without results until the contract in evidence here was entered into. Rasmussen testified that in 1918 during one of plaintiff's visits to Muskegon he called at his office to obtain the services of a stenographer, and while there spoke of this 50-acre tract lying across the highway from the Country Club, stating he would sell it for $2,500, but did not wish to list it with Rasmussen. This is denied by plaintiff who says he did not know Rasmussen or either of the other defendants prior to December 4, 1919, at which time Rasmussen and Edith Brown visited him in Chicago and obtained from him the contract in question.

Mrs. Edith Brown is a waitress by calling, has been divorced from her husband and has a son, Robert, whose age is not given, but who, as she testified, wanted to go into fox raising, for which they thought the sand hills of this 50 acres would be well adapted. She at one time worked at the South Shore Golf Club near this property, and at the time Rasmussen advised her it was for sale she was working as a waitress in a restaurant at which he was in the habit of taking his lunch. She owned a small home and knowing that he was a real estate man asked him if a certain house and lot he had advertised for sale was a good purchase, saying she had a little money to invest. He replied that it was a good bargain but called her attention to this property which he said the owner asked $2,500 for, and told her he thought that was a good deal safer place for her money than to invest it in foxes. She looked at the property with him and became interested to the extent that they went together to Chicago and saw plaintiff. They both positively denied making any misrepresentations to him. It is conceded Mrs. Brown had not previously met him,

and they were dealing at arm's length.    Omitting details of their testimony and accepting plaintiff's own statements, he says they were both strangers to him. He was familiar with Muskegon and its environments, had owned this piece of property since 1910, and since then spent his vacations in Muskegon county, had visited the property during the previous summer, and was not inexperienced in real estate matters.    He not only owned this but other property in Muskegon county which he had for sale, and in connection with his offer of this property for $2,500 also offered to Mrs. Brown other property in that county.    He had also purchased various pieces of property in Chicago for his church, the matter being entrusted to him by the bishop of his diocese, and had cared for and managed the same since its purchase.    He had advertised this property for sale and offered it to her at the price he held it at.    She offered him $2,000 and, as he says, "there was some discussion and haggling back and forth as to what price should be paid."    He testified that she spoke about the detrimental features of the property, such as its being broken by hills and ravines, there being a hospital across the street from it and other matters.    Although he says he depended upon her and Rasmussen's representations as to the value and condition of the property, he himself had owned it since 1910 and seen it every summer when he was spending his vacations in that locality and would seem to have been as familiar with its condition and characteristics as they were.    Some of his testimony on the subject is as follows:

Asked the general question of what took place on these occasions between him and Mrs. Brown and Rasmussen he said:

"She had noticed the sign, said she had seen the sign because she had been working at that hotel on the golf grounds and so she came and was bound to invest her money in it.    One of the points on

which she haggled about the price was that it was across the street from the pest-house or something like that, a house for contagious diseases, and that depressed the value of the property. Outside of that she didn't say much, except that it was farming land, it was not worth much. * * * As I remember, she told me that she had a son that was going to start a fox farm.

"*Q.* What price did you ask?

"*A.* $2,500. The most she would offer was $2,200. * * * She said the most it was worth was $2,200; that is all she would pay. * * *

"*Q.* Will you state whether or not Mr. Rasmussen said anything at this particular time by virtue of the value of this property?

"*A.* No, there was no further discussion about the real value of the property, except that he confirmed and sided with her at the time."

When they first arrived in Chicago Rasmussen left Mrs. Brown somewhere and went to find plaintiff; told him he had a lady in the city who was a prospective purchaser and, as plaintiff testified, described her as a widow, who had recently lost her husband and had some money to invest and when he met her she was dressed in black. That is stressed as one of the deceptions practiced upon plaintiff. The fact is not denied by Mrs. Brown who testified she had recently lost her husband by divorce and was a grass widow, and was even dressed mostly in black which was the clothing she customarily wore in the places where she had worked, the waitresses being required to dress in black.

Finding that plaintiff yet asked $2,500 for the property and was not adverse to negotiations Rasmussen took Mrs. Brown up to see him where, as plaintiff states: "After bargaining back and forth Mrs. Brown and I agreed upon a price of $2,200 for this property." After reaching a tentative agreement they went out to find a conveyancer. Plaintiff said he wanted to see his lawyer, but it was at the time when there was

shortage of coal and the offices were closed early. His attorney was not in, and Rasmussen tried to find another conveyancer whom he knew. He also was not in his office and they finally went to a hotel where they found a stenographer and sat down while Rasmussen dictated the contract, as plaintiff and Mrs. Brown sat by listening and agreeing upon the terms before they were written down, one modification proposed by plaintiff being put in with a pen before he signed the contract.

During these negotiations plaintiff also called Mrs. Brown's attention to other property which he had for sale, and offered her a small farm in Muskegon county, giving her the following memorandum, or option:

"HOTEL LA SALLE.
"Chicago, December 4, 1919.
"I hereby agree to sell within sixty days to the Edith J. Brown, of Muskegon, Michigan, about thirty acres of land with one cottage and barn, situated on lot 4, in the southwestern corner of the county (?) of Fruitland, Muskegon, Michigan, for the sum of twenty-eight hundred dollars, or about 30 acres of lot, with one cottage and barn for (t)he sum of two thousand dollars.
"I agree to accept five hundred ($500) as first payment and two hundred dollars ($200) per year as continued partial payments at the rate of five per cent.
(Signed) "ADELBERT FURMAN."

The contract for the property involved here was written in duplicate and then signed by plaintiff and Mrs. Brown. Mrs. Brown paid him the agreed down payment of $700 in two checks, one for $600 and one for $100, both of which plaintiff indorsed and the one for $100 was given Rasmussen for his commission. The parties disagree as to whose agent Rasmussen was. Plaintiff testified he was not his but represented and was acting for Mrs. Brown, while she testified that Rasmussen was not her agent, she never paid him anything for his services; he represented himself as

acting for plaintiff, called her attention to the property and took her to the owner to see if she could buy it. Though the time and terms of purchase are not made clear, it incidentally appears from this record that she also purchased another piece of property from plaintiff, apparently that covered by the option he gave her. She testified that plaintiff came over to Muskegon in January and took her to see "Sunset Beach" and after she bought it he was over again. In a letter which he wrote her on January 20, 1920, acknowledging one from her, he said among other things:

"As a matter of fact, I feel remorseful for unloading all my Muskegon property on a mere woman, thus depriving her of the means of procuring luxurious necessities of life. Therefore, I have decided to relieve the situation, if you should care, by releasing you of one of the contracts, preferably on the contract on the 50 acres near the city; thus your taxes, interest and payments would be approximately diminished, and you would feel as you would, on Easy street. * * *

"The payment made on the city farm could be applied on Lake Michigan farm, and thus your worry for prepayments, too much interest, too many taxes, would be entirely set aside. * * *

"Hoping to see you next Thursday or Friday, I remain,

"Very truly yours,
(Signed)    "A. FURMAN."

He testified that at the time he wrote this letter:

"It began to dawn on me. I thought that she had made a good bargain and had got a little the best of me. * * *

"*Q.* Were you endeavoring to play a confidence game yourself when you wrote this letter?

"*A.* It was not a confidence game. I can't see it.

"*Q.* Did you really feel this intense sorrow because she was deprived of the luxuries of life by buying this property of you?

"*A.* Well, I sympathized with the lady."

Being pressed further as to this letter and others

he wrote, apparently of similar import though not in the record, he finally said that at the time he wrote the letter to Mrs. Brown of January 20th with relation to relieving her of the contract he did so for the purpose of getting possession of his property, realizing that he had been led into a blunder, and he—

"thought that a forward statement would be of no avail, so that as I realized that trickery had been used against me I should fight trickery with trickery, fire with fire, but I didn't get any results any way.    I do not know what she had stated in that letter I mentioned receiving with reference to this property.    It is all a blank to my mind what she wrote, but she wanted to see me in Muskegon about something."

In the spring of 1920 when activity in the real estate at Muskegon had started towards a boom which followed, plaintiff's impression that Mrs. Brown had got a little the best of him was made more graphic by an attorney of Muskegon who called upon him in Chicago telling him the property was worth $200 an acre.    On visiting Muskegon later he testified that he learned Mrs. Brown "had been offered a fabulous sum for it, that is twenty some thousand dollars and, naturally, I began to seek relief in the courts."    He did not file his bill for relief in the courts until February, 1921, nor make any demand or offer of restitution before doing so.    Mrs. Brown testified that she first learned plaintiff claimed she had overreached him when she was served with process in this case; that some time after she bought the property, when there was a rumor a steel mill was coming to Muskegon, a firm of lawyers offered her one dollar for a 90-day option on this property at $20,000 but they never offered her the money, and all she had seen of that offer was the option and dollar.    She had, however, been offered $5,000 for her contract of purchase.

Real estate operators of Muskegon, who had since plaintiff sold this property seen the long prayed for

development and growth of that city with soaring prices in realty, retrospectively testified to a value of that outlying 50 acres in 1919 at from $150 to $250 per acre; although during 1918 and 1919 it lay there on the market at $50 an acre with signs that it was for sale standing upon it and no purchaser appeared until the end of 1919, when Rasmussen, who knew what was asked for it but made no effort to buy it himself, found a waitress at a restaurant where he lunched as a prospective purchaser and advised her it would be a good investment, as it apparently proved to be. The attorney who visited plaintiff in the spring of 1920, after he had sold it the December before, offered him as plaintiff remembered $3,500 for it, at which time, he testified: "I began to glean the real value of the property." This attorney was one of the witnesses who appraised the property as being worth in 1919 "a minimum value of $250 an acre."

When this sale was made the developments and growth which advanced values had not materialized. There is no evidence of any private or special knowledge by defendants of existing facts assuring their advent. Plaintiff testified that when at Muskegon in the summer of 1919 he did not observe any marked increase in population or activities and there is no evidence of any between then and December of that year. No confidential or fiduciary relations existed between these parties. Plaintiff states he had not met defendants before. He was dealing with them as strangers at arm's length for the sale and purchase of this land with which he was familiar. They are not shown to have made any false statements in relation to it of any existing fact. A disagreement and counter assertions as to value of property over which they were negotiating is not in itself evidence of fraudulent inducements. If they knew of any prospective construction or developments (which is not shown), they were under no legal obligations to inform him of

them.    *Burt* v. *Mason,* 97 Mich. 127.    There were no peculiar circumstances at that time demanding disclosures from them.

"Ordinarily when there are no peculiar circumstances calling for disclosures, as where some confidential or fiduciary relation exists between the parties, a purchaser though having superior judgment of values, does not commit fraud merely by purchasing without disclosing his knowledge of value."    *Pratt Land & Improvement Co.* v. *McClain,* 135 Ala. 452 (33 South. 185, 93 Am. St. Rep. 35).

Defendants Brown have made or tendered the payments due on their land contract and are entitled to full performance according to its terms.

We find no occasion on this record to disturb the conclusions reached in the lower court.

The decree is affirmed, with costs to defendants.

CLARK, C. J., and McDONALD, BIRD, SHARPE, MOORE, FELLOWS, and WIEST, JJ., concurred.